Spear, J.
We have here a controversy involving only the personal property mentioned in items five and six of the will, it being conceded that Mary L. Rossiter took a life estate in the real property and at least a life estate in the personal property, and that archbishop Elder and his successor, archbishop Moeller, a remainder in fee in the real estate in trust for The St. Joseph’s Orphan Asylum.
*434 By the record and argument of counsel two questions are presented. Does the remainder of the personal property go, by proper construction of the will, to Mary L. Rossiter or to archbishops Elder and Moeller, as trustee for the Asylum? If to the latter, then is the agreement entered into between Mary L. Rossiter and archbishop Elder June 30, 1889, effective to give such remainder to Miss Rossiter ?
1. The construction of the will. It was the judgment of both the common pleas and circuit courts that while item five of the will, if it stood alone, would vest absolute title to the whole personal estate in Mary L., after payment of the previous bequests, yet considered in connection with item six, and considering the entire will, taken up by its four corners, to use a common phrase, an intention on the part of the testator is manifest to give to his sister a life estate in the real estate and the use of the personal property for life, with a remainder of the whole estate, personal as well as real, to archbishop Elder and his successor in trust for The St. Joseph’s Orphan Asylum. With this conclusion we agree. The case is reported and the question fully and ably discussed by Swing, J., in 4 O. L. R., 337, and in a brief opinion by Smith, J., in the circuit court in 9 O. C. C., N. S., 535, the latter court resting its conclusion largely upon Robbins v. Smith, 72 Ohio St., 1. The disposition of the question by these two courts seems to us so obviously well founded that we are quite content to rest our conclusion upon those reports, taken in connection with the terms of the will, and do not consider -it necessary to take space with further elaboration of the question here, although it has been very ingeniously argued pro and con by the learned counsel.
*435 2. The contract. Each of the courts below was of opinion that the agreement was entered upon in the utmost good faith, under circumstances showing an emergency, and for the apparent benefit of the beneficiaries under the will, including the Orphan Asylum, and ought for these reasons to be sustained and given effect, and that the authorities on the subject of trusts justify a judgment validating such an agreement, and therefore that this contract should be enforced. Whether or not this conclusion ought to be affirmed depends upon the evidence before the court. There is no finding of facts by the circuit court separate from the conclusions of law, and we are remitted to the bill of exceptions to ascertain what the evidence before that court established. Fortunately there is no conflict in the evidence bearing upon the essential and controlling facts. To sustain the contract two essentials must have been established. One that it rests upon a valid consideration and possesses the element of mutuality, and another that the archbishop was capable in law of making such a contract. The facts relating to the making of the contract rest largely upon the testimony of Mr. Otway J. Cos-grave, and may be briefly summarized. A few days after the decease of Gregory Rossiter, which occurred June 5, 1899, his sister Mary L. Rossiter and Mr. Cosgrave, a practicing lawyer of the Cincinnati bar, went to the box at the safe deposit company and took out the will. Miss Rossiter, on learning its contents, was much irritated, saying it was a foolish will. The lawyer declined to give an opinion as to the proper construction of the will, saying, however, that he didn’t believe the brother intended to make it a mockery by giving her some *436 thing which amounted to nothing. He cautioned her to be patient, saying to her that possibly the matter might be adjusted, and that they would take it up with the archbishop. Soon thereafter he saw the archbishop, giving him a copy of the will, and having a conference with him, saying that he took the liberty of not making' the fact of the contents of the will public because a repugnant or inconsistent will would throw doubt on the mental character of the testator; saying also that he didn’t want the archbishop to accept his judgment or advice but to consult an attorney .and be advised by him, and whatever he then thought right and best, to do. He also called the archbishop’s attention to different parts of the will, especially to items five and six, apparently revoking by item six what was given by item five, expressing the further idea as a lawyer that perhaps technically that is what the testator has done, but he didn’t think he intended to do that. It was in this connection that he advised the archbishop to consult his lawyer and go with him over this and take his advice; that he (Cosgrave) represented Mary, and of course was for his client. A week or so later Miss Rossiter came to Mr. Cos-g'rave, who drew up the agreement and took it to the archbishop and left it with him.
The agreement was executed in duplicate June 30, 1899. Accompanying the duplicate of the agreement returned to Miss Rossiter archbishop Elder addressed a letter of same date to her containing this statement: “There is no need for me to consult an attorney about the signing of the enclosed paper. The matter is clear in itself."’ And the testimony shows that although the archbishop had at the time *437 a legal adviser, he, in fact, did not consult him as to this matter.
The will was admitted to probate June 26, 1899.
The record shows that, by the decrees of the Third Plenary Council of Baltimore, which is the law regulating Catholic church affairs in the United States, and therefore binding upon the archbishop of Cincinnati, when there is a question of disposing of the property or funds belonging to the diocese, or of doing that which has the appearance of an alienation of church property, the bishops are free to act if the amount does not exceed five thousand dollars; but when the sum involved exceeds that amount, then the advice of the consulters must be obtained, and having obtained that, permission must be sought from the Ploly See. The board of consulters, so-called, is an advisory board to the archbishop whom by the decrees he was required to consult in matters of this kind involving over five thousand dollars. He is required to take the counsel and advice of this board, but it is for him to determine finally. Some of the deeds for church property vest the legal title absolutely in the bishop, his heirs and assigns; others do not, but all are in fact in trust for the benefit of the institutions or the churches which have been established.
It is shown that archbishop Elder did not consult any of these consulters respecting the matter; nor did he consult the officers of the Asylum Association having the management of the financial affairs of the Asylum, as was his habit in regard to matters connected with that institution; nor with his successor, the present archbishop, who at the time was his secretary and bore close relations with his *438 superior. This gentleman did not learn of the transaction for years after.
As a result of this showing regarding the essential facts, what ought to be the conclusion of law? With respect to a consideration necessary to support the agreement of the archbishop to cede away the rights of his cestui que trust, it must be conceded that the expressed terms of the paper are at best shadowy. “For and in consideration of the avoidance of litigation and in consideration of mutual concessions tending thereto” is the language. What concessions? The paper is silent. What right or advantage did Miss Rossiter, by this paper, give up that she before possessed? She had made no claim at any time, and did not then, to a larger interest in the real estate than a life estate which is distinctly provided in the will. As to “mutual concessions” what are they? As to this the paper is equally silent. If the claim of consideration is supposed to rest on mutual advantageous promises then clearly we must look outside the paper for them. And when we look to the oral testimony for such promises they seem to elude us. Was there a promise 'to forbear bringing suit to construe the will, or to contest it? In his testimony Mr. Cosgrave disclaims any purpose on his part to bring suit and any knowledge of any such purpose on the part of' Miss Rossiter. He also disclaims having knowledge of any other agreement than that embraced in the written paper. Whatever agreement there was between the parties he attempted to embody in the paper to the best of his ability. She would (but for the will) have had one-half of her brother’s property absolutely, while as it *439 was she got nothing. “I felt,” he says ‘'‘and still feel it was a wise adjustment.”
Coming again to the matter of promises, what promises did Miss Rossiter make in the paper or out of it? We have failed to find any expressed. Is any to be clearly implied? True, there was, at the time of the agreement, danger of a suit to contest the will, and, equally true, if such a suit should prove successful, the Catholic interests would suffer serious detriment. But how do those facts aid in supplying a consideration for the contract? That is, how do they show any consideration moving from Miss Rossiter to the archbishop? What did she do contemporaneous with or subsequent to the making of this agreement which can be fairly attributable to the execution of that paper? She did, indeed, oppose vigorously the effort of the nephews and nieces to break the will, keeping up that opposition to the very last and with such persistency as to prevent any possible compromise of the case. She did this by her testimony and in other ways. But this was the line of conduct which she had mapped out for herself even before the will was probated, and while the question of the will being admitted to probate and record was still undetermined. A favorite nephew whom she loved had, before the probate of the will, turned against her and joined his brothers and sisters to fight the will and she was very much incensed against him and on his leaving gave him her left hand. From that time on she was anxious to maintain the will, and said she would spend every penny of her brother’s fortune to sustain it. This occurred between the time the will was offered for probate and the probating thereof. All this appears from the testi *440 mony of Mr. Cosgrave. It appears further by his testimony that he could not truthfully say that the concessions made by archbishop Elder as to the personal property influenced her in her treatment or defense of the will; and when asked if the real object of getting the archbishop to make the agreement respecting the personalty was that she would vigorously fight for sustaining the will, the witness frankly answered: “No, I wouldn’t say that;” but she was provoked.' It is not shown that she obligated herself to do, or to refrain from doing, anything. And if it had been attempted by the archbishop to specifically enforce any oblig-ation against her growing out of this 'contract, it would be difficult to suggest any possible relief that could have been accorded, or even in reason demanded, or any relief by way of damages for breach of contract.
There remains the question of the power of the archbishop to enter into this agreement. He was trustee for the Orphan Asylum. By the sixth item of the will the remainder of the personal property is given to archbishop Elder, and his successor in office, to be held or disposed of in such way as he or his successor in office may choose for the benefit of the Orphan Asylum. The power of disposition thus given, although in broad terms, cannot be construed as being absolute and unqualified. The dominant idea is that any disposition of the property must be for the benefit of the Orphan Asylum, for the trust exists only for the benefit of the cestui que trust, and by implication at least any attempt at disposition of the property would be expected to be in accordance, as to method, with the established manner of control, disposition and use of the prop *441 erty of the cestui que trust, the Asylum. It is not contended that the archbishop was actuated by any but the best of motives. It is probable, as counsel claim, and especially as shown by the archbishop’s letter to Miss Rossiter, that he believed a proper .construction of the will would give to her the absolute ownership of the personal property, and being convinced upon that point he willingly did that which he considered was right in itself and was calculated to gratify the sister of a brother who had done so much for his cestui que trust. But in this conception as to the will, as we have found, he was mistaken. In this sense the act was inadvertently done: He could not have realized that he was thus parting, or undertaking to part, with a valuable interest of his cestui que trust, for he was of opinion that the Asylum had in fact no interest in the personal property. He was thus induced to act on a mistaken belief which, had the matter been submitted to a court, would not have met its sanction, and to dó an act which the court would in all probability not have authorized. Being so thoroughly satisfied in his own mind, the archbishop took no pains to conform to the usual and indeed the required method with respect to the exercise of his own authority. He did not consult either his cestui que trust as represented by the officers of the Association which had the business of the Asylum in charge, nor with the consulters whom by the law of the church it was his duty to consult, nor with his legal adviser, or any adviser, for that matter. With due respect to the learned courts below we think there was no emergency in the present case which called for hasty action, a condition held to be controlling in some of the cases cited by counsel *442 for defendants in error. As we have found, Miss Rossiter was not proposing to take any step respecting the will which would in the least prejudice the Asylum’s interests. It might have taken a little time to get the consulters together, but some delay would not have worked harm, while a consultation with his immediate associates in office, and with his legal counsel, so strongly recommended by Mr. Cosgrave, could have been had at the farthest in a few hours. Nor can we agree with the court’s conclusion that the archbishop acted in the greatest good faith and exercised a careful judgment. As already stated there is not shown bad faith from the moral standpoint; exactly the opposite appears. But from the legal standpoint how is it? While a trustee will be treated by a court of equity with indulgence and where he has acted in absolute good faith in all respects will be sustained if it can be done without violating equitable rules, yet he will not be upheld in a .course palpably arbitrary or unreasonable, for it is not enough that he be honest and from a moral standpoint act in good faith; he is bound in law to exercise diligence and to act reasonably. Discretionary powers should be exercised in the manner prescribed in the trust instrument, and, in this case, the trust instrument included as well the tenets of the church as the will of the testator. Those tenets (the decrees of the council) enjoined the duty of consultation. While the ultimate judgment, it appears, was to be exercised by the archbishop, yet the duty remained upon him to take reasonable means, and especially the means prescribed, for the enlightenment of that judgment-This duty confessedly the archbishop entirely neglected, and the rule seems to be uniform that *443 where a duty is specifically enjoined, and the trustee absolutely neglects that duty, the mere presence of good intention and absence of bad motive will not be sufficient to prevent him from being held guilty of breach of trust. In the sense here indicated we think the archbishop did not act in the greatest good faith and that his judgment was a hasty rather than a careful judgment. Nor is there force in the suggestion that the contract was in some measure induced by a necessity for keeping the alleged incongruous and inconsistent character of the will from the public. The will had, some days before, been admitted to probate and thus constituted a part of the public records of the county and so open to the inspection of any interested person, and indeed to the whole world.
The case, as made by the pleadings, presents two phases which it is important to keep in mind. Whatever conceivable obligation rests upon the present archbishop because of the agreement is purely executory. Hence the suit is in effect an action to specifically enforce a contract. In another aspect it is a suit to validate an erroneous construction of a will. It is not at all analogous to a case where a trustee who has made investment of the trust fund in good faith and after taking all reasonable means, to ascertain the value of the securities, is sought to be held personally for an unanticipated loss. Hence authorities which apply to that kind of a case scarcely aid the disposition of the case at bar. And reference to those cases is not important here. Indeed we regard this case as resting so entirely upon elementary rules, recognized and enforced everywhere as controlling the conduct of trustees, that we do not regard it *444 important to cite authorities. They have been cited by counsel and will be found collected by the reporter in his notes.
We are satisfied that a court of equity ought not to decree specific enforcement of a contract by a trustee bargaining away the property rights of his cestui que trust, by a ” contract executory in its character and without valuable consideration, and in behalf of a party who was fully aware of the character of the trust and who. in no way changed her position or conduct in consideration of the acts or promises of the trustee.
The judgment of the circuit court will be reversed and judgment entered for plaintiffs in error.

Reversed.

Crew, C. J., Summers, Davis, Shauck and Price, JJ., concur.